**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

DVANTE MASON,

          Defendant.

Case No. 2:17-cr-00239-APG-CWH

**REPORT & RECOMMENDATION**

Presently before the court is defendant Dvante Mason's Motion to Suppress (ECF No. 30), filed June 7, 2018, the government's response (ECF No. 32), filed June 21, 2018, and Mason's reply (ECF No. 33), filed June 28, 2018.  The court conducted an evidentiary hearing on July 17, 2018.  (Mins. of Proceedings (ECF No. 39).)

**I.    BACKGROUND**

Mason was indicted with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2).  (Indictment (ECF No. 1).)  He moves to suppress evidence seized during an unlawful stop and frisk in violation of his Fourth Amendment rights.  (Mot. to Suppress (ECF No. 30).)  The government argues that the officer had reasonable suspicion to stop and frisk Mason.  (Response (ECF No. 32).)

On July 18, 2017, while on duty as a Focus Apprehension Suppression Team Officer,[1] Officer T. Knutson, a two year veteran of the Las Vegas Metropolitan Police Department, was parked in his unmarked patrol car in a parking lot near the intersection of Meadows Lane and Decatur Boulevard in Las Vegas, Nevada.  It was around 7:50 p.m. in the evening, and it was still light out.  Although a country club, fitness center, government buildings, and medical center are there, Officer Knutson considered this to be a high-crime area because he has arrested numerous

---

[1] FAST officers are assigned to high-crime areas to be proactive in detecting and preventing crimes.

individuals for drug crimes there over the last 18 months.  He noticed a group of two young women and a young man (Mason), who he believed were juveniles, walking up the sidewalk across the street.  After a few minutes, the threesome turned into a large vacant parking across the street, walking away from where the officer was parked.  The officer testified that after the threesome had walked into the parking lot, they began looking around, and appeared nervous. One of the women walked back to the sidewalk and approached a man passing by on a bicycle. Officer Knutson saw that she tried to hand the bicyclist money.  The bicycler refused the money and shook his head, and looked in the direction where Officer Knutson was parked.  The woman looked back at her companions in the parking lot, and put her hands out to her sides, palms up. Officer Knutson testified that he believed from these facts that the female companion was either trying to buy drugs or persuade the man to buy alcohol for her.  He drove across the street, entered the parking lot, and drove up to Mason and one of the women who were standing in the parking lot.

Officer Knutson's body camera captured what happened in the next few seconds.[2]  Mason and the woman were motionless and looked at the officer as he arrived.  As Officer Knutson got out of his car, he ordered the two to the front of his car.  Mason had his left hand on the waist of his saggy pants with his right hand to his side, and then he momentarily shifted both hands to the front of his pants as he turned towards the car and walked a few steps to comply with the officer's order.  Officer Knutson walked behind Mason, grabbed his arms, handcuffed him, and frisked him.   Mason's saggy pants fell when he was being frisked.  Officer Knutson discovered a sawed-off shotgun, which is about 2 feet long, in Mason's pant leg.   He removed the shotgun and placed it on the hood of his car.

Officer Knutson testified that he believed the threesome was working together, because they were walking together and were "looking around" in the parking lot, and because of the woman's  hand gestures after she talked to the bicycler.  It was typical for Officer Knutson to see

---

[2] The body camera video, Exhibit B, proved to be critically important in resolving this criminal procedure dispute.  It is neutral in disclosing the details of the event.

1   people walking and holding up their saggy pants with one hand, but he felt that the use of two

2   hands meant that Mason was hiding something.  He felt that Mason stood in a "bladed" stance,

3   meaning that he did not turn towards the officer, but rather turned slightly away.

4           On cross examination, Officer Knutson admitted that he did not include in his report that

5   the threesome was "looking around," and admitted that such details are important.  He said he had

6   watched Mason walk up the street and did not notice anything unusual.  Nor did he see any bulges

7   in Mason's clothing.  He did not find it necessary to approach the woman who tried to buy the

8   drugs or alcohol, or the bicycler, because he believed if he approached the twosome in the

9   parking lot, the woman would return to them.  He did not attempt to contact the bicycler prior to

10  frisking Mason.

11  **II.      DISCUSSION**

12          **A.      The Initial Encounter**

13          It is well established that police may stop a citizen at any time, request identification and

14  other information, and even request permission to search so long as a reasonable innocent person

15  in the citizen's position recognizes that he or she is free to leave or terminate the encounter.  *See*

16  *generally*, *Florida v. Rodriguez*, 469 U.S. 1 (1984); *Florida v. Royer*, 460 U.S. 491 (1983); *Terry*

17  *v. Ohio*, 392 U.S. 1 (1968).  Police officers may approach individuals as to whom they have no

18  reasonable suspicion and ask them potentially incriminating questions as "mere police

19  questioning does not constitute a seizure."  *Florida v. Bostick*, 501 U.S.429, 4344 (1991).

20          For Fourth Amendment purposes, a seizure occurs "when the officer, by means of

21  physical force or show of authority, has in some way restrained the liberty of a citizen . . . ."

22  *Terry*, 392 U.S. at 19 n.16.  "A person has been 'seized' within the meaning of the Fourth

23  Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable

24  person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S.

25  544, 554 (1980).

26          Here, the court finds that Mason was seized by Officer Knutson when he moved to the

27  front of the police car as he was ordered, and was handcuffed.  Officer Knutson testified that

28

1   Mason was detained and not free to leave as soon as he arrived at the scene.  A reasonable person

2   in Mason's circumstances would not believe that he was free to leave.

3       **B.      Investigatory Detention and Frisk**

4       The government argues that Mason was lawfully detained to conduct an investigatory

5   detention based on reasonable suspicion.   Mason asserts his detention violated his Fourth

6   Amendment rights.

7           *1. Investigatory Detention*

8       An investigatory detention under the Fourth Amendment must be supported by

9   "reasonable suspicion" that criminal activity may be afoot.  *See United States v. Arvizu*, 534 U.S.

10  266, 273 (2002); *Terry*, 392 U.S. at 30.  In assessing whether an officer has reasonable suspicion

11  to conduct an investigatory detention, reviewing courts look at the "totality of the circumstances"

12  of each case to see whether the detaining officer had a "particularized and objective basis" for

13  suspecting legal wrongdoing.  *Arizu*, 534 U.S. at 266.  "An investigatory stop must be justified by

14  some objective manifestation that the person stopped is, or is about to be, engaged in criminal

15  activity."  *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also* U*nited States v. Sigmond-*

16  *Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273).

17      A reviewing court's determination of reasonable suspicion is a process that "allows

18  officers to draw on their own experience and specialized training to make inferences from and

19  deductions about the cumulative information available to them that 'might well elude an

20  untrained person.'" *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 418).  The Fourth

21  Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that

22  criminal activity may be afoot and observation of factors which are by themselves consistent with

23  innocence, but may collectively amount to reasonable suspicion.  *Id.* at 273-74.  Reasonable

24  suspicion is not a matter of hard certainties, but of probabilities.  *Cortez*, 449 U.S. at 417-18.

25  However, reasonable suspicion requires more than an officer's "hunch" even if the hunch later

26  turns out to be a good one.  *Terry*, 392 U.S. at 27.  The reasonable suspicion standard is less than

27  a preponderance of the evidence.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

28

1    In this case, although a close call, the court finds that Officer Knutson was justified in

2    detaining Mason, as well as the women, pending further investigation.  He witnessed a situation

3    which he described as "weird," that is, when one of the women left her companions and

4    approached the man on the bicycle and offered him money, which he refused, shaking his head as

5    if to say "no."    Officer Knutson credibly testified that this was a high-crime area, and that he

6    believed the woman had either asked the man on the bicycle to buy alcohol for her, or to sell

7    drugs to her.  When the woman gestured back to her companions, it appeared that the three were

8    working together to accomplish whatever the woman tried to do.  Officer Knutson could have

9    approached the woman and the bicycler to ask what was going on, and so it was not unreasonable

10   to approach the woman's companions to ask the same questions.

11   Of course, there are innocent reasons why a person might approach another and offer

12   money.  Terry contemplates the resolution of such ambiguities during the stop.  In *Adams v.*

13   *Williams*, the Supreme Court explained its holding in *Terry* as follows:

> In *Terry*, this Court recognized that a police officer may in appropriate
> circumstances and in an appropriate manner approach a person for purposes of
> investigating possible criminal behavior even though there was no probable cause
> to make an arrest. The Fourth Amendment does not require a policeman who
> lacks the precise level of information necessary for probable cause to simply
> shrug his shoulders and allow a crime to occur or a criminal to escape.  On the
> contrary, Terry recognizes that it may be the essence of good police work to adopt
> an intermediate response.  A brief stop of a suspicious individual, in order to
> determine his identity or to maintain the status quo momentarily while obtaining
> more information, may be most reasonable in light of the facts known to the
> officer at the time.

21   407 U.S. 143, 145-46 (1972) (citations omitted).  A valid stop can include the momentary

22   restriction on a person's freedom of movement in order to maintain the status quo while making

23   an initial inquiry.  *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981).  "Otherwise, an

24   officer could not perform a preliminary investigation of an alleged wrongdoing."  *United States v.*

25   *Thomas*, 863 F.2d 622, 628 (9th Cir. 1988).  In cases where "the conduct justifying the stop was

26   ambiguous and susceptible of an innocent explanation," *Terry* recognized that the officers could

27   detain the individuals to resolve the ambiguity.  *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000).

28   This was such a case.

2. *The Frisk*

This motion turns on whether Officer Knutson's pat-down frisk was reasonable.  Mason asserts that the frisk was unreasonable because there was no basis to believe that he was armed and dangerous.  The government argues that under the totality of the circumstances, the frisk was reasonable.

A stop-and-frisk under *Terry* constitutes two independent actions, each requiring separate justifications. The stop must be based on a suspicion of criminal activity and the frisk on a reasonable suspicion that the person is armed.  *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988) ("A lawful frisk does not always flow from a justified stop.  Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined.").  During an investigatory detention, an officer may frisk an individual for weapons where he has reason to believe that he is dealing with an armed and dangerous individual.  *Terry*, 392 U.S. at 27.  *Terry* held:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30.  The purpose of the limited search is to allow officers to conduct investigations without fear of violence.  *See Adams v. Williams*, 407 U.S. at 146; *see also United States v. $109,179 in United States Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000).

"The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . ." *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979).  "Nothing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Id.*  In the companion case to *Terry*, the Court further developed the requirements for a frisk:

> The police officer is not entitled to seize and search every person whom he sees
> on the street or of whom he makes inquiries. Before he places a hand on the
> person of a citizen in search of anything, he must have constitutionally adequate,
> reasonable grounds for doing so. In the case of the self-protective search for
> weapons, he must be able to point to particular facts from which he reasonably
> inferred that the individual was armed and dangerous.

*Sibron v. New York*, 392 U.S. 40, 64 (1968). Thus, the central question here is whether Officer Knutson had objectively reasonable grounds to support his decision to frisk Mason.

The Ninth Circuit has identified a variety of factors that can support a reasonable belief that an individual is armed and dangerous. For example, the court has given significant weight to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon. *See*, *e.g.*, *United States v. Alvarez*, 899 F.2d 833, 835, 839 (9th Cir. 1990) (where the court concluded that it was reasonable for officers to frisk the defendant after observing a "large bulge underneath his jacket"); *cf. United States v. Thomas*, 863 F.2d 622, 629 (9th Cir. 1988) (where the court did not find reasonable suspicion that a defendant was armed, in part, because officers did not see any suspicious bulges in his clothing). Sudden movements by defendants, or repeated attempts to reach for an object that was not immediately visible, have been considered actions that can give rise to a reasonable suspicion that a defendant is armed. *See*, *e.g.*, *United States v. Flippin*, 924 F.2d 163, 164-66 (9th Cir. 1991) (officer alone in room with woman who grabbed a bag while he was looking away); *cf. Ybarra*, 444 U.S. at 93 (not finding reasonable suspicion where defendant, "whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening."). The nature of the suspected crime may give rise to the inference that the suspect is armed and dangerous. Some crimes are so frequently associated with weapons that the mere suspicion that an individual has committed them justifies a pat down search. *See United States v. $ 109,179 in U.S. Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000) (in the course of a large-scale narcotics dealing case, the suspect identified as a person involved in the drug activity came to the place where the drugs were being sold, and was subsequently lawfully frisked). *But see*, *United States v. Flatter*, 456 F.3d 1154, 1157-58 (9th Cir. 2006) (mail theft is not a crime frequently associated with weapons).

1   Officer Knutson testified that he saw no bulges and that Mason was compliant with his

2   orders.  A crime had not been identified.[3]  Officer Knutson testified that the reason he frisked

3   Mason was that he believed, based upon the way Mason was holding his pants at the moment he

4   approached him in the parking lot, and that Mason "bladed" his stance, that Mason was hiding

5   something.

6   Officer Knutson had the opportunity to observe Mason as he walked up the street and in

7   the parking lot, as well as when he stood in the parking lot before he approached them, and

8   testified that he noticed nothing unusual.  Officer Knutson's body camera recording showed that

9   it only took a few seconds from the time he got out of his car until he walked behind Mason to

10  begin his frisk.  In that few seconds, Mason was motionless and silent until he was ordered to the

11  front of the car.  When he was told to move to the front of the car, he had his left hand on his

12  waist and his right hand to his side.  Officer Knutson said he had previously seen people holding

13  up their saggy pants, and did not find it unusual.  As Mason moved toward the officer's car, he

14  briefly moved his right hand to his waist for less than a second, and then returned the right hand

15  to his side.  By then, Officer Knutson was already moving behind Mason as he turned toward the

16  car and began to cuff Mason.  Officer Knutson said, "I'm patting you down because right now I

17  don't know who you are" and "you are acting weird walking through here."

18  *Terry* contemplates that, when crime is afoot, the officer will make reasonable inquiries,

19  and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his

20  own or others' safety, a frisk is appropriate.   Here, before he conducted the frisk, Officer

21  Knutson asked no questions of Mason to determine his identity or his relationship with the man

22  on the bicycle, yet it was the interaction with the bicycler that made him suspicious.  Such an

23  inquiry might have provided a basis for Officer Knutson to resolve the ambiguity in the situation.

24  _____

25  [3] Although the incident occurred in a high-crime area, and that fact provides relevant
    context in a *Terry* analysis, presence in a high-crime area, standing alone, is not enough to
26  provide reasonable suspicion.  *See Wardlow*, 528 U.S. at 674.  Even in high-crime areas, where
    the possibility that any given individual is armed is significant, *Terry* requires reasonable,
27  individualized suspicion before a frisk for weapons can be conducted. *See Maryland v. Buie*, 494
28  U.S. 325, 334 (1990).

1   *See Wardlow*, 528 U.S. at 125 (in cases where "the conduct justifying the stop was ambiguous

2   and susceptible of an innocent explanation[,] . . .*Terry* recognized that the officers could detain

3   the individuals to resolve the ambiguity.")  *See also, $109,179 in United States Currency*, 228

4   F.3d at 1086 (one of the bases to justify the frisk of defendant was that his answers failed to

5   dispel the officer's reasonable suspicion that he was armed and dangerous).

6           Based on the foregoing, after carefully considering the need for the officer to protect

7   himself with Mason's Fourth Amendment rights to be free from unreasonable search and seizure,

8   the court finds that the pat-down frisk of Mason was not supported by an objectively reasonable

9   belief that he was armed and presently dangerous, a belief which must exist before a frisk occurs.

10  *See Adams v. Williams*, 407 U.S. 143, 146 (1972); *Terry*, 392 U.S. at 21-24, 27.  Consequently,

11  the court concludes that Mason's Fourth Amendment right to be free from unreasonable search

12  and seizure was violated; thus, the firearm seized as a result of the unlawful search, and

13  subsequent on-scene statements must be suppressed.  *See Wong Sun v. United States*, 371 U.S.

14  471 (1963) (evidence obtained in violation of the Fourth Amendment and evidence derived from

15  it may be suppressed as the "fruit of the poisonous tree.").[4]

16  **III.    CONCLUSION**

17          IT IS THEREFORE RECOMMENDED that Dvante Mason's Motion to Suppress

18  Evidence (ECF No. 30) be GRANTED.

19  //

20  //

21  //

22  //

23  //

24  //

25

26

27

28  _____

    [4] "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."  *Arizona v. Hicks*, 480 U.S. 321, 329 (1987).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: August 2, 2018

_____
C.W. HOFFMAN, JR.
UNITED STATES MAGISTRATE JUDGE